Rachel Sykes [11778]
**PEARSON BUTLER**
1802 S. Jordan Parkway, Suite 200
South Jordan, Utah 84095
(801) 495-4104
rachel@pearsonbutler.com

Jean S. Martin (*pro hac vice* forthcoming)
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 559-4908
jeanmartin@ForThePeople.com

*Counsel for Plaintiff and the Proposed Class*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| **THOMAS KUKITZ**, on behalf of himself and others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**HEALTHEQUITY, INC.,**<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**PROPOSED CLASS ACTION**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Thomas Kukitz, individually and on behalf of the Class defined below of similarly situated persons ("Plaintiff and Class Members"), alleges the following against Defendant HealthEquity, Inc., ("Defendant" or "HealthEquity"). The following allegations are based on Plaintiff's knowledge, investigations by Plaintiff's counsel, facts of public record, and information and belief:

1

## NATURE OF THE ACTION

1.     Plaintiff seeks to hold Defendant responsible for the injuries HealthEquity inflicted on Plaintiff and over 4.3 million others due to Defendant's egregiously inadequate data security, which resulted in the private information of Plaintiff and those similarly situated to be exposed to unauthorized third parties (the "Data Breach").

2.     HealthEquity is a health savings account administrator, specializing in providing health savings accounts ("HSA"), flexible spending accounts ("FSA"), health reimbursement arrangements, and 401(k) retirement plans.

3.     The data that HealthEquity exposed to the public is unique and highly sensitive. For one, the exposed data included personal identifying information ("PII") and protected health information ("PHI") like names, addresses, telephone numbers, employee IDs, employers, Social Security numbers, health card numbers, health plan member numbers, dependent information, HealthEquity benefit types, diagnoses, prescription details, and payment card information, and/or HealthEquity account types (collectively "Private Information").

4.     Plaintiff and Class Members provided this information to HealthEquity with the understanding HealthEquity would keep that information private in accordance with both state and federal laws.

5.     On March 25, 2024, HealthEquity detected unusual activity on its information technology systems. But it was not until June that HealthEquity was able to confirm that an authorized threat actor had accessed the Private Information of Plaintiff and Class Members.

6. Upon information and belief, the actual Data Breach occurred on or about March 9, 2024.[1]

7. Among myriad industry standards and statutes for protection of sensitive information, PHI is specifically governed by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations. HIPAA requires entities like HealthEquity to take appropriate technical, physical, and administrative safeguards to secure the privacy of PHI, establishes national standards to protect PHI, and requires timely notice of a breach of unencrypted PHI.

8. Instead of following these rules, however, HealthEquity disregarded the rights of Plaintiff and Class Members by intentionally, willfully, recklessly, and/or negligently failing to implement reasonable measures to safeguard Private Information and by failing to take necessary steps to prevent unauthorized disclosure of that information. HealthEquity's woefully inadequate data security measures made the Data Breach a foreseeable, and even likely, consequence of its negligence.

9. Exacerbating the injuries to Plaintiff and Class Members, HealthEquity failed to provide timely notice to Plaintiff and Class Members, depriving them of the chance to take speedy measures to protect themselves and mitigate harm.

10. Today, the Private Information of Plaintiff and Class Members continue to be in jeopardy because of Defendant's actions and inactions described herein. Plaintiff and Class

---

[1] *See Data Breach Notifications*, Office of the Maine Attorney General, https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/2ec3e314-5731-49d0-a937-6dc22c6b24f3.html (last accessed on Aug. 6, 2024) (specifying that the Data Breach occurred on March 9, 2024).

Members now suffer from a heightened and imminent risk of fraud and identity theft for years to come and now must constantly monitor their medical and financial accounts for unauthorized activity.

11.     The PII and PHI exposed in the Data Breach can enable criminals to commit a litany of crimes. Criminals can open new financial accounts in Class Members' names, take out loans using Class Members' identities, use Class Members' names to obtain medical services, use Class Members' health information to craft phishing and other hacking attacks based on Class Members' individual health needs, use Class Members' identities to obtain government benefits, file fraudulent tax returns using Class Members' information, obtain driver's licenses in Class Members' names (but with another person's photograph), and give false information to police during an arrest.

12.     As a direct and proximate result of the Data Breach, Plaintiff and Class Members have suffered actual and present injuries, including but not limited to: (a) present, certainly impending, and continuing threats of identity theft crimes, fraud, scams, and other misuses of their Private Information; (b) diminution of value of their Private Information; (c) loss of benefit of the bargain (price premium damages); (d) loss of value of privacy and confidentiality of the stolen Private Information; (e) illegal sales of the compromised Private Information; (f) mitigation expenses and time spent responding to and remedying the effects of the Data Breach; (g) identity theft insurance costs; (h) "out of pocket" costs incurred due to actual identity theft; (i) credit freezes/unfreezes; (j) anxiety, annoyance, and nuisance; (k) continued risk to their Private Information, which remains in HealthEquity's possession and is subject to further breaches so long as HealthEquity fails to undertake appropriate and adequate measures to protect Plaintiff's and

4

Class Members' Private Information; and (l) disgorgement damages associated with HealthEquity's maintenance and use of Plaintiff's data for its benefit and profit.

13.     Through this action, Plaintiff seeks to remedy these injuries on behalf of himself and all similarly situated individuals whose Private Information was exposed and compromised in the Data Breach.

14.     Plaintiff brings this action against HealthEquity and asserts claims for negligence and negligence *per se*, unjust enrichment, breach of fiduciary duty, and breach of implied contract.

## PARTIES

15.     Plaintiff Thomas Kukitz is a natural person, resident, and citizen of Florida.

16.     Defendant HealthEquity, Inc. is a Delaware corporation with its principal place of business located in Draper, Utah.HEAL

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. And minimal diversity is established because Plaintiff (and many members of the Nationwide Class) are citizens of states different than Defendant.

18.     This Court has general personal jurisdiction over Defendant because Defendant's principal place of business and headquarters are in Draper, Utah. Defendant also regularly conducts substantial business in Utah.

19.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because substantial part of the events giving rise to the claims emanated from activities within this District, and Defendant conducts substantial business in this District.

## FACTUAL ALLEGATIONS

*Defendant Collected and Stored the Private Information of Plaintiff and Class Members*

20.     HealthEquity is a benefits account administrator, specializing in administering HSAs, FSAs, health reimbursement arrangements, and 401(k) retirement plans for employers and their employees across the country.

21.     Plaintiff and Class Members provided their Private Information to HealthEquity in conjunction with establishing and maintaining a benefits account, such as an HSA.

22.     HealthEquity collects Private Information from Plaintiff and Class Members such as their names, addresses, phone numbers, employee IDs, Social Security numbers, health card numbers, health plan member numbers, dependent information, HealthEquity benefit types, diagnoses, prescription details and payment card data in the ordinary course of business. Upon information and belief, this Private Information is then stored on Defendant's systems.

23.     Because of the highly sensitive and personal nature of the information HealthEquity acquires and stores, HealthEquity knew or reasonably should have known that it must comply with healthcare industry standards related to data security and all federal and state laws protecting Private Information and provide adequate notice if Private Information is disclosed without proper authorization.

24. Indeed, HealthEquity both explicitly and implicitly promised Plaintiff and Class Members that it used reasonable measures to safeguard the Private Information it collects from theft and misuse.

25. Recognizing its legal and equitable duties, HealthEquity represents the following in its General Privacy Notice:

> HealthEquity *places a high priority on protecting your personal information*. We maintain administrative, technical, and physical safeguards designed to protect the information that you provide on this website and in connection with the Services from unauthorized access to or acquisition of such information. *Please be advised, however, that regardless of our best efforts to protect information, the confidentiality and security of any communication or material transmitted to or from the website or via email cannot be guaranteed to be 100% secure at any time. We also cannot guarantee that the information you transmit over the Internet will not be unlawfully intercepted or accessed by third parties. Any transmission of your information is at your own risk*. Therefore, we strongly encourage all users to be careful and responsible about what you choose to provide online. Further, when you create an Account with HealthEquity, you will create a unique password. It is your responsibility to personalize your password and protect and secure such password. HealthEquity is not responsible for any information compromised due to your failure to secure your Account or login credentials.[2]

26. HealthEquity misrepresented to Plaintiff and Class Members via its General Privacy Notice that it has administrative, technical, and physical safeguards sufficient to protect Plaintiff's and Class Members' Private Information. Upon information and belief, including from information gathered from the Data Breach at issue and subsequent cybersecurity issues within Defendant's computer network, that representation is not true.

27. Plaintiff and Class Members provided their Private Information to HealthEquity as a condition of receiving products and services from HealthEquity, but in doing so, expected

---

[2] *General Privacy Notice*, HealthEquity, Inc. (May 2023), https://www.healthequity.com/privacy/general (last accessed on Aug. 6, 2024).

HealthEquity to keep their Private Information confidential and securely maintained, to use this information for business and healthcare purposes only, and to make only authorized disclosures of this information.

*The Data Breach*

28.     The Notice of Data Breach posted on Defendant's website states:

**Notice of Data Breach**

HealthEquity and Further by HealthEquity have determined that a data security event may have resulted in limited unauthorized access to or disclosure of certain participant identifying information in our care as managed by one of our vendors. We are not aware of any actual or attempted misuse of information because of this incident to date. HealthEquity Inc. (HealthEquity) is the custodian of HSAs and a directed third-party administrator of FSA/HRA, Commuter, COBRA, and Lifestyle plans associated with the respective covered entities listed below, which you may work for or have worked for in the past. The data security incident resulted in unauthorized access to or disclosure of some individuals' information.

**What happened?**
After receiving an alert, on March 25, 2024, HealthEquity became aware of a systems anomaly requiring extensive technical investigation and ultimately resulting in data forensics until June 10, 2024. Through this extensive work, we discovered some unauthorized access to or disclosure of protected health information and/or personally identifiable information stored in an unstructured data repository outside our core systems. On June 26, 2024, after validating all the data, we unfortunately determined that some of member PHI and/or PII was involved.

**What information may have been involved?**
The affected data was sign-up information for accounts and benefits we administer. The data may include information in one or more of the following categories: first name, last name, address, telephone number, employee ID, employer, social security number, health card number, health plan member number, dependent information (for general contact information only), HealthEquity benefit type, diagnoses, prescription details, and payment card information (but not payment card number), and / or HealthEquity account type. Not all data categories were affected for every member.

**What are we doing?**
We take the security of personal information entrusted to our care very seriously. Once we detected the unauthorized activity, we immediately launched an investigation and engaged

third-party experts to determine the nature and scope of the incident. We learned during our investigation that a vendor's user accounts — which had access to certain of our systems — were compromised, and that because of this, an unauthorized party was able to access a limited amount of data stored in an unstructured data repository outside our core systems. As a result of our investigation, we took immediate actions including disabling all potentially compromised vendor accounts and terminating all active sessions; blocking all IP addresses associated with threat actor activity; and implementing a global password reset for the impacted vendors. Additionally, we enhanced our security and monitoring efforts, internal controls, and security posture.

**What you can do.**
Because of the impact this might have on you, HealthEquity has arranged credit identity monitoring, insurance, and restoration services for a period of two years, free of charge, through Equifax. Impacted individuals will be provided with a unique activation code that they can use to enroll online at www.equifax.com/activate. They will also be provided with a deadline by which they need to activate these services.

The Reference Guide includes information on general steps you can take to monitor and protect your personal information. We encourage you to carefully review financial statements, credit reports and other accounts to ensure that all account activity is valid.[3]

29.     Upon information and belief, Plaintiff's and Class Members' affected Private Information at the time of the Data Breach was accessible, unencrypted, unprotected, and vulnerable for acquisition and/or exfiltration by unauthorized individuals.

30.     Upon information and belief, HealthEquity was a target by due to its status as healthcare related entity that collects, creates, and maintains Private Information.

31.     The Notice of Data Breach provided on HealthEquity's website gives no details to Plaintiff or Class Members regarding the manner and means of how their Private Information was disclosed and leaves Plaintiff and Class Members wondering how they can protect themselves.

---

[3] *Notice of Data Breach*, HealthEquity, Inc., https://www.healthequity.com/breach (last accessed on Aug. 6, 2024). As of the filing of this Complaint, Plaintiff has not received notice of the Data Breach from HealthEquity; rather, his employer has advised him that he was impacted by the Data Breach.

32. Time is of the essence when highly sensitive Private Information is subject to unauthorized access and/or acquisition. The disclosed, accessed, and/or acquired Private Information of Plaintiff and Class Members is now likely available on the Dark Web. Hackers can access and then offer for sale the unencrypted, unredacted Private Information to criminals.

33. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the possible publication of their Private Information, especially their Social Security numbers and sensitive medical information, onto the Dark Web. Plaintiff and Class Members face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing hundreds of thousands of Social Security numbers and/or specific, sensitive medical information.

34. HealthEquity largely put the burden on Plaintiff and Class Members to take measures to protect themselves from identity theft and fraud.

35. Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.6% of U.S.-based workers are compensated on an hourly basis, while the other 44.4% are salaried.[4]

36. According to the American Time Use Survey, American adults have between 4 to 6 hours of "leisure time" outside of work per day;[5] examples of leisure time include partaking in

---

[4] *Characteristics of minimum wage workers, 2022*, U.S. Bureau of Labor Statistics (Aug. 2023), https://www.bls.gov/opub/reports/minimum-wage/2022/home.htm (last accessed on Aug. 6, 2024).
[5] *Americans have no idea how to use their free time*, Business Insider (Mar. 26, 2024), https://www.businessinsider.com/americans-free-time-leisure-dont-use-television-2024-3 (last accessed on Aug. 6, 2024).

sports, exercise and recreation; socializing and communicating; watching TV; reading; thinking/relaxing; playing games and computer use for leisure; and other leisure activities.[6] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

37.     Plaintiff and Class Members are deprived of the choice as to how to spend their valuable free hours and therefore seek renumeration for the loss of valuable time as another element of damages.

38.     Seemingly HealthEquity plans to offer at least some of those impacted by the Data Breach identity monitoring services for a period of two years. Such measures, however, are insufficient to protect Plaintiff and Class Members from the lifetime risks they each now face. As another element of damages, Plaintiff and Class Members seek a sum of money sufficient to provide to Plaintiff and Class Members identity theft protection services for their respective lifetimes.

39.     Plaintiff and the Class Members remain in the dark regarding exactly what data was stolen, the particular method of disclosure, the results of any investigations, and what steps are being taken, if any, to secure their Private Information going forward. Plaintiff and Class Members are left to speculate as to the full impact of the Data Breach and how exactly

---

[6] *Table 11A. Time spent in leisure and sports activities for the civilian population by selected characteristics, averages per day, 2022 annual averages*, U.S. Bureau of Labor Statistics (June 22, 2023), https://www.bls.gov/news.release/atus.t11A.htm (last accessed on Aug. 6, 2024).

Defendant intends to enhance its information security systems and monitoring capabilities so as to prevent further breaches.

40.     HealthEquity could have prevented the Data Breach by properly securing and encrypting and/or more securely encrypting its servers generally, as well as Plaintiff's and Class Members' Private Information.

41.     Defendant's negligence in safeguarding Plaintiff's and Class Members' PII and PHI was exacerbated by repeated warnings and alerts directed to protecting and securing sensitive data, as evidenced by the trending data breach attacks in recent years.

42.     Healthcare organizations have become a main target for cybercriminals because they "hold a massive amount of patient data — including medical records, financial information, Social Security numbers, names and addresses. They're also among the few businesses that stay open 24/7, meaning they might be more likely to prioritize avoiding disruptions and, therefore, more likely to pay a hacker's ransom."[7]

43.     In the context of data breaches, healthcare is "by far the most affected industry sector."[8] Further, cybersecurity breaches in the healthcare industry are particularly devastating, given the frequency of such breaches and the fact that healthcare providers maintain highly sensitive and detailed PII.[9]

_____

[7] Elise Takahama, *Why health care has become a top target for cybercriminals*, The Seattle Times (Feb. 25, 2024), https://www.seattletimes.com/seattle-news/health/why-health-care-has-become-a-top-target-for-cybercriminals/ (last accessed on Aug. 6, 2024).
[8] Tenable Security Response Team, *Healthcare Sec.*, TENABLE (Mar. 10, 2021), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches (last accessed on Aug. 6, 2024).
[9] *See id.*

44.     Despite the prevalence of public announcements of data breaches and data security compromises, Defendant failed to take appropriate steps to protect Plaintiff's and Class Members' Private Information from being compromised.

45.     HealthEquity failed to properly train its employees as to cybersecurity best practices and to maintain proper staffing and processes for responding to and preventing network intrusions.

46.     HealthEquity  failed to implement sufficient processes to quickly detect and respond to data breaches, security incidents, or intrusions.

47.     HealthEquity  failed to encrypt Plaintiff's and Class Members' Private Information and monitor user behavior and activity to identify possible threats.

48.     HealthEquity  failed to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the Private Information of Plaintiff and Class Members.

49.     HealthEquity  failed to timely and accurately disclose that Plaintiff's and Class Members' PII and PHI had been improperly acquired or accessed.

50.     HealthEquity  knowingly disregarded standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII and PHI.

***Defendant Failed to Comply with FTC Guidelines***

51.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[10] To that end, the FTC has issued numerous

---

[10]     *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf. (last accessed on Aug. 6, 2024).

guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII and PHI.

52.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[11] The guidelines explain that businesses should:

   a.     protect the personal customer information that they keep;

   b.     properly dispose of personal information that is no longer needed;

   c.     encrypt information stored on computer networks;

   d.     understand their network's vulnerabilities; and

   e.     implement policies to correct security problems.

53.     The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

54.     The FTC recommends that companies not maintain PII and PHI longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[12]

---

[11] *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM'N (Oct. 2016), https://bit.ly/3u9mzre (last accessed on Aug. 6, 2024).
[12] *Start with Security: A Guide for Business*, FED. TRADE COMM'N (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf (last accessed on Aug. 6, 2024).

55.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

56.     These FTC enforcement actions include actions against healthcare providers and partners like Defendant. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

57.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

58.     Despite its alleged commitments to securing sensitive data, HealthEquity does not follow industry standard practices in securing Private Information.

59.     As shown above, experts studying cyber security routinely identify healthcare related entities as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

60.     Several best practices have been identified that at a minimum should be implemented by healthcare entities like Defendant, including but not limited to, educating all

employees on the risks of cyber attacks; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

61. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

62. Upon information and belief, HealthEquity failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

63. Such frameworks are the existing and applicable industry standards in the healthcare industry. And HealthEquity failed to comply with these accepted standards, thus opening the door to criminals and the Data Breach.

### Defendant Violated HIPAA and HITECH

64. HIPAA circumscribes security provisions and data privacy responsibilities designed to keep medical information safe. HIPAA compliance provisions, commonly known as

the Administrative Simplification Rules, establish national standards for electronic transactions and code sets to maintain the privacy and security of protected health information.[13]

65.     HIPAA provides specific privacy rules that require comprehensive administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of PII and PHI is properly maintained.[14]

66.     The Data Breach itself resulted from a combination of inadequacies showing Defendant failed to comply with safeguards mandated by HIPAA. Defendant's security failures include, but are not limited to:

a.      Failing to ensure the confidentiality and integrity of electronic PHI that it creates, receives, maintains and transmits in violation of 45 C.F.R. § 164.306(a)(1);

b.      Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

c.      Failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding

---

[13] HIPAA lists 18 types of information that qualify as PHI according to guidance from the Department of Health and Human Services Office for Civil Rights, and includes, *inter alia*: names, addresses, any dates including dates of birth, Social Security numbers, and medical record numbers.

[14] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R. § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

d. Failing to ensure compliance with HIPAA security standards by Defendant's workforce in violation of 45 C.F.R. § 164.306(a)(4);

e. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1);

f. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

g. Failing to identify and respond to suspected or known security incidents and failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. § 164.308(a)(6)(ii);

h. Failing to effectively train all staff members on the policies and procedures with respect to PHI as necessary and appropriate for staff members to carry out their functions and to maintain security of PHI in violation of 45 C.F.R. § 164.530(b) and 45 C.F.R. § 164.308(a)(5); and

i. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard PHI, in compliance with 45 C.F.R. § 164.530(c).

67.     Defendant acknowledges in its General Privacy Notice that the Private Information collected by Defendant is subject to HIPAA's requirements. Defendant thus agrees that it will comply with HIPAA.[15] The Data Breach, however, which resulted from a combination of insufficiencies, demonstrates that Defendant indeed failed to comply with safeguards mandated by HIPAA regulations.

68.     HealthEquity is also required to follow the regulations for safeguarding electronic medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

69.     Both HIPAA and HITECH obligate HealthEquity to follow reasonable security standards, respond to, contain, and mitigate security violations, and to protect against disclosure of sensitive Private Information. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); 45 C.F.R. § 164.530(f); 42 U.S.C. § 17902.

***Plaintiff's Experiences and Injuries Caused by the Data Breach***

70.     Plaintiff and Class Members are current and former members of HealthEquity's health plans.

71.     As a prerequisite of receiving a health benefits plan from HealthEquity, Defendant required Plaintiff and Class Members to provide their Private Information.

72.     HealthEquity began notifying Plaintiff and Class Members about the Data Breach on or around July 2024.

---

[15] *See General Privacy Notice*, HealthEquity, Inc. (May 2023), https://www.healthequity.com/privacy/general (last accessed on Aug. 6, 2024).

73.     When HealthEquity finally announced the Data Breach, it deliberately underplayed the severity and obfuscated the nature of the Data Breach. Defendant's Notice of Data Breach fails to adequately explain how the breach occurred, what exact data elements of each affected individual were compromised, and the extent to which those data elements were compromised.

74.     Because of the Data Breach, Defendant inflicted injuries upon Plaintiff and Class Members. And yet, Defendant has done little to provide Plaintiff and the Class Members with relief for the damages they suffered.

**A. Plaintiff Thomas Kukitz**

75.     Plaintiff Thomas Kukitz is an adult individual and a natural person of Florida, residing in Citrus County, where he intends to stay.

76.     HealthEquity obtained Plaintiff's information through the course of administering Plaintiff's FSA account. HealthEquity collects and maintains personal and sensitive information of its benefit account holders, such as Plaintiff, in order to administer these accounts.

77.     Plaintiff's employer advised him that his Private Information was compromised in the Data Breach.

78.     Plaintiff is a reasonably cautious person and is therefore careful about sharing his sensitive Private Information. As a result, he has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff stores any documents containing his sensitive PII in a safe and secure location or destroys the documents. Moreover, Plaintiff diligently chooses unique usernames and passwords for his various online accounts, changing and refreshing them as needed to ensure his information is as protected as it can be.

When it is available to him Plaintiff uses two-factor or multifactor authentication to add an extra layer of security to his Private Information.

79.     Plaintiff only allowed Defendant to maintain, store, and use his Private Information because he believed that Defendant would use basic security measures to protect his Private Information, such as requiring passwords and multi-factor authentication to access databases storing his Private Information. As a result, Plaintiff's Private Information was within the possession and control of Defendant at the time of the Data Breach.

80.     In the instant that his Private Information was accessed and obtained by a third party without his consent or authorization, Plaintiff suffered injury from a loss of privacy.

81.     Upon information and belief, as a result of the Data Breach, Plaintiff was advised that his Private Information was exposed onto the dark web for theft and sale.

82.     Plaintiff has been further injured by the damages to and diminution in value of his Private Information—a form of intangible property that Plaintiff entrusted to Defendant. This information has inherent value that Plaintiff was deprived of when his Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, later placed for sale on the dark web.

83.     Furthermore, Plaintiff has experienced a dramatic increase in the amount of spam he has been receiving as a result of the Data Breach.

84.     The Data Breach has also caused Plaintiff to suffer imminent and impending injury arising from the substantially increased risk of additional future fraud, identity theft, and misuse resulting from his Private Information being placed in the hands of criminals.

85.     As a result of the actual harm he has suffered and the increased imminent risk of future harm, Plaintiff spends approximately five (5) hours since the Data Breach driving to his bank and speaking on the phone with his bank, combing through his financial records, billing statements, and credit history to stay vigilant against potential fraud or identity theft. This time, which has been lost forever and cannot be recaptured, was spent at Defendant's direction.

86.     The substantial risk of imminent harm and loss of privacy have caused Plaintiff to suffer stress, fear, and anxiety. Plaintiff has a continuing interest in ensuring that Plaintiff's Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***Plaintiff and the Class Face Significant Risk of Present and Continuing Identity Theft***

87.     Plaintiff and Class Members suffered injury from the misuse of their PII and PHI that can be directly traced to Defendant.

88.     The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII and PHI secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

89.     In 2021, 32% of persons aged 16 or older who received breach notification were victims of multiple types of identity theft.[16]

90.     As a result of Defendant's failures to prevent—and to timely detect—the Data Breach, Plaintiff and Class Members suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

    a.     The loss of the opportunity to control how their PII and PHI is used;

    b.     The diminution in value of their PII and PHI;

    c.     The compromise and continuing publication of their PII and PHI;

    d.     Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    e.     Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    f.     Delay in receipt of tax refund monies;

    g.     Unauthorized use of stolen PII and PHI; and

---

[16] Erika Harrell, PhD, *Data Breach Notifications and Identity Theft, 2021*, U.S. Bureau of Justice Statistics (Jan. 2024), https://bjs.ojp.gov/data-breach-notifications-and-identity-theft-2021. (last accessed on Aug. 6, 2024).

h.       The continued risk to their PII and PHI, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII and PHI in their possession.

91.      Stolen PII and PHI is one of the most valuable commodities on the criminal information black market. According to Prey, a company that develops device tracking and recovery software, stolen PII and PHI can be worth up to $2,000.00 depending on the type of information obtained.[17]

92.      The value of Plaintiff's and the Class's Private Information on the black market is considerable. Stolen PII and PHI trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

93.      It can take victims years to spot or identify PII and PHI theft, giving criminals plenty of time to milk that information for cash.

94.      One such example of criminals using PII and PHI for profit is the development of "Fullz" packages.[18]

---

[17] Juan Hernandez, *The Lifecycle of Stolen Credentials on the Dark Web*, Prey (Feb. 26, 2024), https://preyproject.com/blog/lifecycle-stolen-credentials-dark-web (last accessed on Aug. 6, 2024).

[18] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials

95.     Cyber-criminals can cross-reference two sources of PII and PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

96.     The development of "Fullz" packages means that stolen PII and PHI from the Data Breach can easily be used to link and identify it to Plaintiff and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII and PHI stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII and PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

---

associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SEC. (Sep. 18, 2014), https://krebsonsecurity.com/tag/fullz/ (last accessed on Aug. 6, 2024).

97. According to the FBI's Internet Crime Complaint Center (IC3) 2023 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $12.5 billion in losses to individuals and business victims.[19]

98. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

99. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII and PHI. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

100. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[20]

---

[19] 2023 Internet Crime Report, Fed. Bureau of Investig. (2023), https://www.ic3.gov/Media/PDF/AnnualReport/2023_IC3Report.pdf (last accessed on Aug. 6, 2024).
[20] *Commissioner Pamela Jones Harbour: Remarks Before FTC Exploring Privacy Roundtable*, FED. TRADE COMMISSION (Dec. 7, 2009), https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last accessed on Aug. 6, 2024).

101.    The FTC has issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[21] According to the FTC, data security requires: (1) controlling access to data sensibly; (2) requiring secure passwords and authentication; (3) storing sensitive information securely and protecting it during transmission; (4) segmenting networks and monitoring who is trying to get in and out; (5) securing remote access to networks; (6) applying sound security practices when developing new products; (7) ensuring that third-party service providers implement reasonable security measures; (8) putting in place procedures to keep security current and address potential vulnerabilities; and (9) securing paper, physical media, and devices.[22]

102.    According to the FTC, unauthorized PII and PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money, and patience to resolve the fallout.[23] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act (the "FTCA").

103.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ¶ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication

---

[21] *Start With Security, A Guide for Business*, Fed. Trade Comm'n (Aug. 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/920a_start_with_security_en_aug2023_508_final_0.pdf. (last accessed on Aug. 6, 2024).
[22] *Id.*
[23] *See Taking Charge, What to Do If Your Identity is Stolen*, FED. TRADE COMM'N, at 3 (Jan. 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen (last accessed on Aug. 26, 2024).

procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ¶ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations. Defendant thus knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of PII and PHI.

104.    Healthcare organizations have become a main target for cybercriminals because they "hold a massive amount of patient data — including medical records, financial information, Social Security numbers, names and addresses. They're also among the few businesses that stay

open 24/7, meaning they might be more likely to prioritize avoiding disruptions and, therefore, more likely to pay a hacker's ransom."[24]

105.     Charged with handling highly sensitive PII and PHI including healthcare information, financial information, and insurance information, Defendant knew or should have known the importance of safeguarding the PII and PHI that was entrusted to it. Defendant also knew or should have known of the foreseeable consequences if its data security systems were breached. Defendant nevertheless failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

106.     Defendant's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the PII and PHI of Plaintiff and over 4.3 million members of the proposed Class to unscrupulous operators, con artists, and outright criminals.

## CLASS ACTION ALLEGATIONS

107.     Plaintiff brings this class action individually and on behalf of all members of the following Class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiff seeks certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) of the following Nationwide Class (the "Class"):

**Nationwide Class**

---

[24] Elise Takahama, *Why health care has become a top target for cybercriminals*, The Seattle Times (Feb. 25, 2024), https://www.seattletimes.com/seattle-news/health/why-health-care-has-become-a-top-target-for-cybercriminals/ (last accessed on Aug. 6, 2024).

All persons in the United States whose Private Information was compromised in
the Defendant's Data Breach.

108.    The Class defined above is readily ascertainable from information in Defendant's
possession. Thus, such identification of Class Members will be reliable and administratively
feasible.

109.    Excluded from the Class are: (1) any judge or magistrate presiding over this action
and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors,
predecessors, affiliated entities, and any entity in which Defendant or their parent has a controlling
interest, and their current or former officers and directors; (3) persons who properly execute and
file a timely request for exclusion from the Class; (4) persons whose claims in this matter have
been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and
Defendant's counsel; (6) members of the jury; and (7) the legal representatives, successors, and
assigns of any such excluded persons.

110.    Plaintiff reserves the right to amend or modify the Class definitions as this case
progresses.

111.    Plaintiff satisfies the numerosity, commonality, typicality, and adequacy
requirements under Fed. R. Civ. P. 23.

112.    **Numerosity**. Class Members are numerous such that joinder is impracticable.
While the exact number of Class Members is unknown to Plaintiff at this time, based on
information and belief, the Class consists of the approximately 4.3 million individuals whose PII
and PHI were compromised by Defendant's Data Breach.

113. **Commonality**. There are many questions of law and fact common to the Class. And these common questions predominate over any individualized questions of individual Class Members. These common questions of law and fact include, without limitation:

    a.    If Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' PII and PHI;

    b.    If Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.    If Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations including, *e.g.*, HIPAA;

    d.    If Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

    e.    If Defendant owed a duty to Class Members to safeguard their PII and PHI;

    f.    If Defendant breached its duty to Class Members to safeguard their PII and PHI;

    g.    If Defendant knew or should have known that its data security systems and monitoring processes were deficient;

    h.    If Defendant should have discovered the Data Breach earlier;

    i.    If Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

j.     If Defendant's delay in informing Plaintiff and Class Members of the Data Breach was unreasonable;

k.     If Defendant's method of informing Plaintiff and Class Members of the Data Breach was unreasonable;

l.     If Defendant's conduct was negligent;

m.     If Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

n.     If Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

o.     If Defendant breached implied contracts with Plaintiff and Class Members;

p.     If Defendant was unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

q.     If Defendant failed to provide notice of the Data Breach in a timely manner, and;

r.     If Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

114.     **<u>Typicality</u>**. Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach. Moreover, Plaintiff and Class Members were subjected to Defendant's uniformly illegal and impermissible conduct.

115.	**Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiff's counsel is competent and experienced in litigating complex class actions. Plaintiff has no interests that conflict with, or are antagonistic to, those of the Class.

116.	**Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and Class Members' data was stored on the same computer system and unlawfully exposed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

117.	**Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class Member.

118.	The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class

Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

119. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

120. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include those set forth above.

121. Defendant has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Negligence and Negligence *Per Se***
**(On Behalf of Plaintiff and the Nationwide Class)**

122. Plaintiff re-alleges and incorporates by reference paragraphs 1 to 121 of the Complaint as if fully set forth herein.

123. Defendant owed a duty under common law to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information and keep it from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

124. Defendant's duty to use reasonable care arose from several sources, including but not limited to those described below.

34

125.    Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing Private Information that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

126.    Defendant breached its duties owed to Plaintiff and Class Members and thus was negligent. Defendant breached these duties by, among other things: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of Private Information; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to follow its own policies and practices published to its employees and clients.

127.    But for Defendant's wrongful and negligent breach of their duties owed to Plaintiff and Class Members, the Private Information would not have been compromised.

128.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect Private Information. Various FTC

publications and orders also form the basis of Defendant's duty.

129. Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Private Information and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of a data breach involving the Private Information of its customers.

130. Plaintiff and Class Members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

131. Defendant's violation of Section 5 of the FTC Act constitutes negligence per se.

132. The harm that has occurred as a result of Defendant's conduct is the type of harm that the FTC Act was intended to guard against.

133. Defendant violated its own policies by actively disclosing Plaintiff and Class Members' PHI; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PHI; failing to maintain the confidentiality of Plaintiff and Class Members' records; and by failing to provide timely notice of the breach of PHI to Plaintiff and Class Members.

134. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered injuries, including:

    a. Theft of their Private Information;

    b. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

    c. Costs associated with purchasing credit monitoring and identity theft protection

services;

d. Lowered credit scores resulting from credit inquiries following fraudulent activities;

e. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant's Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

f. The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

g. Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiff and Class Members' data against theft and not allow access and misuse of their data by others;

h. Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff and Class Members' data;

i. Loss of their privacy and confidentiality in their PHI;

j. The erosion of the essential and confidential relationship between Defendant—

as a health savings account administrator—and Plaintiff and Class Members as employees and clients; and

k. Loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received.

135. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Nationwide Class)**

136. Plaintiff re-alleges and incorporates by reference paragraphs 1 to 121 of the Complaint as if fully set forth herein.

137. Plaintiff and Class Members conferred a benefit on Defendant by entrusting their Private Information to HealthEquity from which HealthEquity derived profits.

138. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII and PHI. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide adequate security.

139. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

140. Defendant acquired the PII, and PHI through inequitable means in that Defendant failed to disclose the inadequate security practices, previously alleged, and failed to maintain adequate data security.

141. If Plaintiff and Class Members knew that Defendant had not secured their PII and PHI, they would not have agreed to disclose their data to Defendant.

142. Plaintiff and Class Members have no adequate remedy at law.

143. As a direct and direct an proximate result of HealthEquity's conduct, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised Private Information; (ii) invasion of privacy; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in HealthEquity's possession and is subject to further unauthorized disclosures or further entrustment to inadequate third party vendors so long as HealthEquity fails to undertake appropriate and adequate measures to protect the Private Information; (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII/PHI for

the rest of their lives; (ix) the present value of ongoing credit monitoring and identity defense services necessitated by HealthEquity's data breach; (x) the value of the unauthorized access to their PII/PHI permitted by Defendant; and (xi) any nominal damages that may be awarded.

144. Plaintiff and Class Members are entitled to restitution and/or damages from HealthEquity and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by HealthEquity from its wrongful conduct, as well as return of their sensitive Private Information and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

145. Plaintiff and Class Members may not have an adequate remedy at law against HealthEquity, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**THIRD CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Nationwide Class)**

146. Plaintiff re-alleges and incorporates by reference paragraphs 1 to 121 of the Complaint as if fully set forth herein.

147. A relationship existed between Plaintiff, the Class Members, and Defendant, which arose from Defendant's acceptance of Plaintiff's and the Class Members' PII and PHI and Defendant's representations of its commitment to protect said PII and PHI.

148. HealthEquity became the guardian of Plaintiff's and Class Members' Private Information. HealthEquity became a fiduciary, created by its undertaking and guardianship of Plaintiff's and Class Members' Private Information, to act primarily for their benefit. This duty

included the obligation to safeguard Plaintiff's and Class Members' Private Information and to timely detect and notify Plaintiff and Class Members in the event of a data breach.

149. The interests of public policy mandates that a fiduciary duty is imputed given Defendant's acceptance of Plaintiff's and the Class Members' Private Information and Defendant's representations of its commitment to protect said Private Information.

150. Defendant breached the fiduciary duty that it owed to Plaintiff and Class Members because Defendant failed to act with the utmost good faith, fairness, honesty, the highest degree of loyalty, ultimately failed to protect the Private Information of Plaintiff and Class Members.

151. Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

152. But for Defendant's breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

153. Defendant's breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

154. As a direct and proximate result HealthEquity's breaches of its fiduciary duties, Plaintiff and Class Members have suffered or will suffer concrete injury, including, but not limited to: (a) actual identity theft; (b) the loss of the opportunity to determine how and when their Private Information is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their Private Information; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their Private Information; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and

future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their Private Information, which remains in HealthEquity's possession and is subject to further unauthorized disclosures so long as HealthEquity fails to undertake appropriate and adequate measures to protect Private Information in its continued possession and ensure that it retains vendors who adequately protect Private Information; (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, and repair the impact of the Private Information compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and (h) nominal damages.

155.     As a direct and proximate result of HealthEquity breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**FOURTH CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Nationwide Class)**

156.     Plaintiff re-alleges and incorporates by reference paragraphs 1 to 121 of the Complaint as if fully set forth herein.

157.     Through their course of conduct, Defendant, Plaintiff, and Class Members entered into contracts for the provision of medical benefit plans, as well as implied contracts for Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Private Information.

158.     Specifically, Plaintiff entered into a valid and enforceable implied contract with Defendant when they first applied for or obtained medical benefit plans from HealthEquity.

159. The valid and enforceable implied contracts to provide medical benefit plans that Plaintiff and Class Members entered into with Defendant and/or its customers include the promise to protect non-public Private Information given to Defendant or that Defendant creates on its own from disclosure.

160. When Plaintiff and Class Members provided their Private Information to Defendant and/or its customers in exchange for medical benefit plans, they entered into implied contracts with Defendant pursuant to which Defendant agreed to reasonably protect such information.

161. Defendant and/or its agents solicited and invited Class Members to provide their Private Information as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their Private Information to Defendant.

162. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations, including HIPAA, and were consistent with industry standards.

163. Class Members who paid money to Defendant reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

164. Under the implied contracts, Defendant and/or its customers promised and were obligated to: (a) provide medical benefit plans to Plaintiff and Class Members; and (b) protect Plaintiff's and the Class Members' PII/PHI: provided to obtain such healthcare services; and/or created as a result of providing such services. In exchange, Plaintiff and Members of the Class agreed to pay money for these medical benefit plans, and to turn over their Private Information.

165.     Both the provision of medical benefit plans and the protection of Plaintiff's and Class Members' Private Information were material aspects of these implied contracts.

166.     The implied contracts for the provision of medical benefit plans —contracts that include the contractual obligations to maintain the privacy of Plaintiff's and Class Members' Private Information—are also acknowledged, memorialized, and embodied in multiple documents, including (among other documents) Defendant's privacy notices.

167.     Defendant's express representations memorialize and embody the implied contractual obligation requiring Defendant to implement data security adequate to safeguard and protect the privacy of Plaintiff's and Class Members' Private Information.

168.     Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep their Private Information associated with obtaining healthcare private. To Plaintiff and Class Members, healthcare services that do not adhere to industry standard data security protocols to protect Private Information is fundamentally less useful and less valuable than healthcare that adheres to industry-standard data security. Plaintiff and Class Members would not have entrusted their Private Information to Defendant and/or its customers and entered into these implied contracts with Defendant without an understanding that their Private Information would be safeguarded and protected or entrusted their Private Information to Defendant in the absence of its implied promise to monitor its computer systems and networks to ensure that it adopted reasonable data security measures.

169.     A meeting of the minds occurred, as Plaintiff and Members of the Class agreed to and did provide their Private Information to Defendant and/or its Agents, and paid for the provided

services in exchange for, amongst other things, both the provision of healthcare services and the protection of their Private Information.

170.     Plaintiff and Class Members performed their obligations under the contract when they paid for their medical benefit plans and provided their Private Information.

171.     Defendant materially breached its contractual obligation to protect the non-public Private Information Defendant gathered when the sensitive information was accessed by unauthorized personnel as part of the Data Breach.

172.     Defendant materially breached the terms of the implied contracts. Defendant did not maintain the privacy of Plaintiff's and Class Members' Private Information as evidenced by its notifications of the Data Breach to Plaintiff and approximately 4.3 million Class Members. Specifically, Defendant did not comply with industry standards, standards of conduct embodied in statutes like HIPAA and Section 5 of the FTCA, or otherwise protect Plaintiff's and the Class Members' Private Information, as set forth above.

173.     The Data Breach was a reasonably foreseeable consequence of Defendant's actions in breach of these contracts.

174.     As a result of Defendant's failure to fulfill the data security protections promised in these contracts, Plaintiff and Members of the Class did not receive the full benefit of the bargain, and instead received medical services that were of a diminished value to that described in the contracts. Plaintiff and Class Members therefore were damaged in an amount at least equal to the difference in the value of the medical services with data security protection they paid for and the medical services they received.

175. Had Defendant disclosed that its security was inadequate or that it did not adhere to industry-standard security measures, neither the Plaintiff, the Class Members, nor any reasonable person would have purchased medical benefit plans from Defendant and/or its affiliated healthcare providers.

176. As a direct and proximate result of the Data Breach, Plaintiff and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including without limitation the release and disclosure of their Private Information, the loss of control of their Private Information, the imminent risk of suffering additional damages in the future, disruption of their medical benefit plans, out-of-pocket expenses, and the loss of the benefit of the bargain they had struck with Defendant.

177. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

178. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit and identity monitoring to all Class Members.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiff, on behalf of himself and all others similarly situated, request the following relief:

A.     An Order certifying this action as a class action and appointing Plaintiff as the Class Representative;

B.     A mandatory injunction directing Defendant to adequately safeguard the PII and PHI of Plaintiff and the Class hereinafter by implementing improved security procedures and measures, including but not limited to an Order:

     i.     prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

     ii.     requiring Defendant to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

     iii.     requiring Defendant to delete and purge the PII and PHI of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

     iv.     requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII and PHI;

     v.     requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring, simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

     vi.     prohibiting Defendant from maintaining Plaintiff's and Class Members' PII and PHI on a cloud-based database until proper safeguards and processes are implemented;

     vii.     requiring Defendant to segment data by creating firewalls and access

controls so that, if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

viii. requiring Defendant to conduct regular database scanning and securing checks;

ix. requiring Defendant to monitor ingress and egress of all network traffic;

x. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII and PHI, as well as protecting the PII and PHI of Plaintiff and Class Members;

xi. requiring Defendant to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xii. requiring Defendant to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Defendant's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated; and

xiii. requiring Defendant to meaningfully educate all Class Members about the threats that they face because of the loss of its confidential personal identifying information to third parties, as well as the steps affected

individuals must take to protect themselves.

C.    A mandatory injunction requiring that Defendant provide notice to each member of the Class relating to the full nature and extent of the Data Breach and the disclosure of PII and PHI to unauthorized persons;

D.    Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII and PHI;

E.    An award of damages, including actual, nominal, consequential damages, and punitive, as allowed by law in an amount to be determined;

F.    An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

G.    An award of pre- and post-judgment interest, costs, attorneys' fees, expenses, and interest as permitted by law;

H.    Granting the Plaintiff and the Class leave to amend this Complaint to conform to the evidence produced at trial;

I.    For all other Orders, findings, and determinations identified and sought in this Complaint; and

J.    Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38(b), Plaintiff demand a trial by jury for any and all issues in this action so triable as of right.


Dated: August 7, 2024            Respectfully Submitted,

*/s/ Rachel L. Sykes*
Rachel Sykes
**PEARSON BUTLER**
1802 S. Jordan Parkway, Suite 200
South Jordan, Utah 84095
(801) 495-4104
rachel@pearsonbutler.com

JEAN S. MARTIN
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 559-4908
jeanmartin@ForThePeople.com


*Lead Counsel for Plaintiff and the Class*